UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS FREEMAN, | ) | |
| Plaintiff, | ) | No. 11 C 08599 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DOROTHY BROWN, *et al.*, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On December 3, 2009, Plaintiff Dennis Freeman was arrested outside his home for making allegedly harassing phone calls to Dorothy Brown, the Clerk of the Circuit Court of Cook County. Freeman was charged with misdemeanor harassment by telephone, but the charges were ultimately dismissed. Freeman then brought this suit against Brown, two employees in the Clerk's office (Melvin Darby and Jerry Davis), several Cook County deputy sheriffs, and the County under 42 U.S.C. § 1983, alleging various constitutional violations related to his arrest and detention.[1] R. 1, Compl. Freeman also asserted a claim for malicious prosecution under Illinois law.[2] *Id.* The Clerk Defendants (Brown, Darby, and Jerry Davis) and the Sheriff Defendants (the deputy sheriffs and Cook County) now move for summary judgment. R. 81, Clerk Defs.' Mot. Summ. J.; R. 84, Sheriff Defs.' Mot.

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a). Citation to the docket is "R." followed by the docket entry.
[2]Although Freeman was initially represented by retained counsel, and then recruited *pro bono* counsel, he is now proceeding *pro se*. *See* R. 75, May 2, 2014 Minute Entry (granting Freeman's recruited attorney's motion to withdraw).

Summ. J. For the reasons discussed below, Defendants' motions for summary judgment are granted.

## I. Background

In deciding Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to Freeman. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Between the hours of 11:49 a.m. and 3:30 p.m. on November 3, 2009, Freeman called the Cook County Clerk's publicly listed office phone number and left six voicemail messages. Clerk SOF ¶ 5; Sheriff SOF ¶ 3.[3] In the first message, Freeman states that he is "trying to get ahold of that big whore, Dorothy Brown." R. 83-2, Voicemail Tr. at 3:11-13. Freeman was upset that his records had been lost or tampered with at the Markham Courthouse, and called the Clerk's Office to complain about the "whorey, bitchy, backward nigger type of operation here in Cook County." R. 86-1, Freeman Dep. at 25:21-27:4; Voicemail Tr. at 4:12-13.

Throughout the messages, Freeman repeatedly insults Brown in the vilest terms possible, calling her a "bitch," a "whore," a "nigger," a "monkey head," a "big baboon," a "baboon black ass mother fucking whore," and a "bastard." Voicemail Tr.

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are "Clerk DSOF" (for the Clerk Defendants' Statement of Facts) [R. 83] and "Sheriff DSOF" (for the Sheriff Defendants' Statement of Facts) [R. 86]. Although Freeman was given the statement to *pro se* litigants required under Local Rule 56.2, *see* R. 82, Rule 56.2 Statement; R. 87, Rule 56.2 Statement, and was given more than two months to respond, he did not respond to the Defendants' motions. Freeman did leave voicemail messages with this Court's staff, even after being admonished about *ex parte* communications with the Court. After receiving the voicemail, the Court directed Freeman to immediately file a written motion seeking relief from the briefing schedule. R. 92, May 8, 2015 Minute Entry. Freeman has not done so. So, where Defendants' statements of facts are properly supported by record evidence, they will be deemed admitted. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

2

at 3:12, 3:16, 5:6, 7:2, 7:6, 11:16-12:1, 13:10-12, 18:10, 26:8-10, 27:16, 28:2, 28:14, 29:7-16. He states that Brown should "get off her fat black ass" and call him back. *Id.* at 27:11-12. Freeman also complains at length about Brown's appearance and his perception that she is trying to "look white," saying that he is "not impressed by her white-looking, uh, wanna-be hair and her makeup and her lipstick and her, uh, you know, her jewelry and her pearl necklace and all her bullshit crap that she expounds." *Id.* at 5:5-15, 18:13-16, 26:2-12, 28:2-12. Freeman's insults were not confined to Brown. He calls Clerk's Office employees "niggers" who talk "a bunch of ebonics shit," "bitch[es]," "whores," and "slutty, whorey, bitchy liars." *Id.* at 18:7-10, 23:9-10, 24:5-6. The woman speaking on the Clerk's voicemail greeting is a "sweet-talking baboon" who should "stick some horns on her head, [and] put some fangs on." *Id.* at 12:12-16. He calls the twenty public defenders who worked with him over the years "niggers" and "fat-ass whorey bitches and sluts" with "white hair." *Id.* at 11:5-8. He calls President Obama a "knucklehead," a "homo," and a "big black mother fucker" with a "goofy smile" and a handshake like a "wimpy fish," and he refers to the First Lady as a "baboon-face." *Id.* at 15:2-12; 20:5-10. Former State's Attorney Richard Devine is called a "moron mother fucker" and a "homo," and Governors Patrick Quinn and Rod Blagojevich are called "backward" and "nigger[s]." *Id.* at 10:5-12, 30:2-3.

Freeman's voicemail messages are also not limited to complaints about his missing records; he runs through a slew of problems that he blames, at least in part, on Brown and the Clerk's Office. Freeman has sleep apnea due to a collapsed nasal

3

tip that he never got repaired. *Id.* at 4:9-14. Freeman says that Brown's "fucked-up system" required him to spend more than a thousand dollars on breathing apparatus to treat his sleep apnea. *Id.* at 5:1-8. He also apparently blames Brown's system for requiring him to go to court because of his ex-wife's allegation that he scratched her car. *Id.* at 11:5-6:7. Freeman claims that, because he had to go to court, his daughters were both abused, he lost $50,000, and he was unable to pay his rent. *Id.* According to Freeman, Brown "fucked over [his] life" when she failed to "get involved." *Id.* at 28:6-12. As a result, all of his belongings were stolen, he and his two daughters were homeless, and he and his daughters could not get medical treatment. *Id.* Freeman also accuses Brown of failing to get involved when a public defender, Noreen Love, called him a "fucking idiot." *Id.* at 29:5-15. Freeman then chastises Brown for neglecting to "focus on the molestation that happens in court" and says that she should not run for office again because she has "fucked up everything." *Id.* at 13:13-16. He also accuses Brown of being driven around by chauffeurs and misappropriating government funds. *Id.* at 25:1-11.

After hearing these messages, the Clerk's office employees passed them along to the Clerk's Security Office and its Chief Investigator, Jerry Davis. Clerk SOF ¶ 20. Davis, a former Chicago police officer, thought the messages "were vile in nature and loaded with the most inappropriate racial epithets and curse words." R. 83-3, Davis Decl. ¶ 3. Although there were no "direct overt threats against Clerk Brown," Davis found that there "was a troubling theme throughout the message[s] where it appeared that Freeman blamed Clerk Brown for all of a series of

4

calamitous events that happened to him." *Id*. Based on his experience as a police officer and Chief Investigator at the Clerk's Security Office, Davis concluded that there was probable cause to arrest Freeman for the charge of harassment by telephone, 720 ILCS 135/1-1. *Id*. ¶¶ 5, 7. Davis shared the messages with Brown's Director of Security, Melvin Darby, and they reported the messages to law enforcement. Sheriff SOF ¶¶ 10-11; R. 86-2, Arrest Report at 3.

Detectives David Cammack and James Johnston of the Cook County Sheriff's Police were assigned to the investigation. Arrest Report at 1. After hearing the messages and interviewing Clerk's Office employees, Cammack and Johnston began to look for Freeman. *Id*. at 3; Sheriff SOF ¶ 12. When the detectives eventually found Freeman's then-current residence, they tried to speak with Freeman there. Arrest Report at 3. The detectives spoke with one of Freeman's daughters, who said that her father was not home. *Id*. The detectives left a business card and asked the daughter to have Freeman call them as soon as possible. *Id*. Freeman claims that he spoke with Johnston at least twice over the next few days. Freeman Dep. at 106:14-109:6. Despite these phone calls, the detectives continued to look for Freeman without success. Arrest Report at 3. Cammack and Johnston enlisted the help of the Fugitive Warrant Unit to find Freeman, which included Investigators Kevin Badon, David Baez, Mike Mendez, and James Duffy. *Id*.

On December 3, 2009, Freeman left his house to take his daughters to work. Freeman Dep. at 245:3-246:18. When he tried to start his car, it made a strange noise and quickly died. *Id*. at 248:2-20. That is when Freeman noticed an unmarked

5

SUV pulling up next to his car. *Id.* at 248:21-249:13. Several officers in plain clothes—perhaps the Fugitive Warrant Unit—got out of the SUV and surrounded Freeman's car and began to shout at him to get out of the vehicle. *Id.* at 250:11-252:7. Because his car had died, Freeman was not able to unlock the doors. 252:2-9. Eventually, Freeman was able to unlock the door manually, and he opened the car door. *Id.* at 252:10-253:13. The officers immediately pulled Freeman out of the car. *Id.* When the officers let him go, Freeman stumbled due to a medical condition that reduced the muscle tone in his legs. *Id.* at 253:14-256:11. The officers picked him up again, and immediately put his hands behind his back to handcuff him. *Id.* As the officers handcuffed Freeman, his teenaged[4] daughter screamed "Hey he has a bad arm. Leave his arm alone. He's got a broken arm. His shoulder is messed." *Id.* at 255:12-256:1. Then Freeman told the officers that "I can't have my arm put—I have a ripped supraspinatus tendon." *Id.* The handcuffing officer said, "Oh, you will be okay," and cuffed him anyway. *Id.* But handcuffing Freeman caused him intense pain; he was "screaming in pain the whole way" to the station. *Id.* at 258:7-18. He asked the officer to remove the cuffs. *Id.* The handcuffs were not removed until Freeman reached the Markham Courthouse lockup. Sheriff SOF ¶ 16. Because of the handcuffing, Freeman's left shoulder was dislocated, and he suffers continuing pain from that injury. Freeman Dep. at 234:18-23. Freeman did not see a doctor

---

[4]The exact age of this daughter is not stated in the record, but she was nine years old in 2001 or 2002 when she was questioned by Noreen Love. *See* Freeman Dep. at 27:20-28:21, 35:7-36:20. So in 2009, when the arrest at issue in this case occurred, she was around sixteen or seventeen years old.

6

immediately after his arrest, but he did see a doctor to treat his shoulder within a year. Sheriff SOF ¶ 18.

Two days after his arrest, Freeman was charged with a misdemeanor count of harassment by telephone in a complaint signed by Melvin Darby. Clerk SOF ¶ 30. Ten months later, the Cook County State's Attorney's Office opted to dismiss the charge by an order of *nolle prosequi*. *Id.* ¶ 31; Compl. ¶ 16. Freeman then initiated this case against Brown, Darby, Davis, and the involved Sheriff's Police officers, alleging malicious prosecution, excessive force, unlawful seizure, and failure to intervene. *See generally* Compl. He also brought a claim for municipal liability against Cook County under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). *Id.* All Defendants moved for summary judgment and provided Freeman with the statement to *pro se* litigants required under Local Rule 56.2. Freeman nevertheless failed to file a response to the motion.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make

7

credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Freeman alleges five claims in his complaint. He first brings a state-law malicious prosecution claim against the Clerk Defendants, Detective Cammack, Detective Johnston, and Sergeant James Davis for their role in Freeman's misdemeanor harassment by telephone charge. Compl. ¶¶ 19-30. In Count 2, he claims that the Sheriff Defendants used excessive force in effectuating his arrest by handcuffing him behind his back despite their awareness of his preexisting shoulder injury. *Id.* ¶¶ 31-40. He next alleges that all Defendants unlawfully seized him by falsely arresting him without articulable suspicion, probable cause, or a warrant in violation of the Fourth Amendment. *Id.* ¶¶ 41-47. In Count 4,[5] Freeman alleges that the Sheriff Defendants failed to intervene to prevent the false arrest and excessive force. *Id.* ¶¶ 48-54. Finally, Freeman alleges that Cook County is liable for the acts

---

[5]Count 4 is mistakenly labelled as Count 10 in the complaint.

8

of its agents due to an official policy or custom.[6] *Id.* ¶¶ 55-72. Because the malicious-prosecution and false-arrest claims both depend on the existence of probable cause, the Court addresses those claims first. The Court will then address the excessive force and municipal liability claims in turn.

### A. Malicious Prosecution and False Arrest

Under Illinois law, a lack of probable cause is an essential element of a malicious prosecution claim. *Swick v. Liataud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The same is true for claims of false arrest. *Thayer v. Chiczewski*, 705 F.3d 237, 246-47 (7th Cir. 2012). "Probable cause exists if, at the time of the arrest, the facts and circumstances within the defendant's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed an offense." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010) (internal quotation marks and alteration omitted). Probable cause is an objective inquiry, and it is evaluated "on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Id.*; *accord Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010). Although the existence of probable cause is ordinarily a question of fact, it may be decided as a matter of law if the "underlying facts claimed to support probable cause are not in dispute." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). In this case, there is no dispute about the content of Freeman's voicemail messages, which is the asserted basis of probable cause. So the

---

[6]This Count is mistakenly labelled Count 12 in the complaint, though it is the fifth Count.

9

Court must decide whether the content of these messages was sufficient to warrant a prudent person to believe that Freeman had committed the crime of harassment by telephone.

A person commits harassment by telephone if he "[m]ak[es] a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number." 720 ILCS 135/1-1.[7] Although Freeman did not make any direct or overt threats in his voicemail messages, a reasonable person listening to those messages could conclude that Freeman intended to harass or abuse Brown or her employees. Freeman left six voicemail messages in a four-hour span. The messages were laden with profanity and racial and gendered slurs—Freeman used variations on the words "nigger," "whore," and "bitch" dozens of times in the short messages. Voicemail Tr. at 3:12, 3:16, 4:12, 5:6, 7:2, 7:6, 11:16-12:1, 13:10-12, 18:10, 26:8-10, 27:16, 28:2, 28:14, 29:7-8, 29:7-16. Freeman was not just complaining that Brown's office allegedly lost his records; he seemed to blame Brown for myriad medical and personal problems, intensifying his (perceived) motive to take action on his anger. Voicemail Tr. at 4:9-14, 5:1-8, 11:5-6:7, 28:6-12, 29:5-15. He also repeatedly insults her appearance, her intelligence, and her honesty, using foul language and racial stereotypes. *Id.* at 5:5-15, 18:13-16, 26:2-12, 28:2-12. Moreover, Freeman's grievances were communicated in an aggressive, angry tone, at some points outright yelling. *See generally* Recordings of Voicemail Messages. Given the frequency, tone, language, and content of the messages, it was reasonable for

---

[7]In 2013, the offense of telephone harassment was recodified under 720 ILCS 5/26.5-2.

10

Clerk's Office employees and the deputy sheriffs to conclude that Freeman intended to abuse or harass Brown in violation of Illinois law. Defendants therefore had probable cause to arrest and prosecute Freeman for the crime of harassment by telephone.

Even if there were not probable cause, Defendants would be entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine if officials are entitled to qualified immunity, courts must evaluate (1) "whether the plaintiff has alleged a deprivation of a constitutional right," and (2) "whether the right at issue was clearly established at the time and under the circumstances presented." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

Assuming that there was a deprivation of a constitutional right (which, as discussed above, there was not), that right was not clearly established, meaning, a reasonable officer would not know that there was not probable cause. Put another way, a right is only "clearly established" if "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (internal quotation marks and citation omitted). The doctrine of qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995)

(internal quotation marks and citation omitted). If "reasonable minds could differ as to the meaning of the law," the official is entitled to qualified immunity. *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 723 (7th Cir. 2013). Based on the profanity, tone, frequency, and content of the voicemail messages (which are undisputed), Defendants had a "reasonable basis to conclude that probable cause existed." *Eversole*, 59 F.3d at 717-18. At a minimum, reasonable minds could differ as to whether Freeman's voicemail messages were intended to harass or abuse Brown or her staff. Defendants are therefore entitled to qualified immunity.

Because Defendants had probable cause to believe that Freeman had committed the offense of harassment by telephone, and even if they did not, they are shielded by qualified immunity, they are entitled to summary judgment on Freeman's malicious-prosecution and false-arrest claims.[8] Because there was no false arrest, there could be no failure to intervene on the false arrest. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation."). Summary judgment is granted on that claim as well.

### B. Excessive Force

Freeman alleges that the Sheriff Defendants used excessive force in arresting him when they handcuffed him behind his back despite knowing about his shoulder injury. He also claims that the Sheriff Defendants—presumably those who did not

---

[8]Because Defendants had probable cause or, at the very least, qualified immunity, it is not necessary for the Court to address the Clerk Defendants' argument that Freeman failed to allege personal involvement by Brown. But, given the meager record on what, if any, action Brown herself actually took in Freeman's case, it is unlikely that the claim against her would survive even in the absence of probable cause.

12

actually apply the allegedly excessive force—failed to intervene to stop the use of excessive force against him. The Sheriff Defendants argue both that the force used was not excessive as a matter of law and that they are shielded by qualified immunity. R. 85, Sheriff Defs.' Br. at 6-8.

Drawing all reasonable inferences in favor of Freeman, a reasonable factfinder could conclude that excessive force was used in handcuffing Freeman behind his back; the problem, as explained below, is the absence of evidence of who did what, or even who was around to possibly intervene. Allegations of excessive force are analyzed under the reasonableness standard of the Fourth Amendment. *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003). To determine if force is unreasonable, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citation omitted). Ordinarily, police officers are entitled to use some degree of physical force in effectuating an arrest. *Id.* But "an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Id.* Where arresting officers are aware of a preexisting injury or medical condition that would be aggravated by handcuffing an arrestee, the officers are "obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff" the arrestee. *Id.*; *see also Rabin v. Flynn*, 725 F.3d 628, 636 (7th Cir. 2013).

In this case, Freeman testifies that both he and his daughter told the arresting officers about Freeman's preexisting shoulder condition. Freeman Dep. at 255:12-256:1. True, a reasonable officer could not be expected to understand what Freeman meant when he referenced his "supraspinatus tendon," and it was likely not excessive to at least *initially* handcuff Freeman, as split-second decision-making was required in the aftermath of Freeman's unusual exit from the car. But after the cuffing, the arresting officer would have known that Freeman's teenaged daughter had yelled out to the officers, in plain language, that "[h]is shoulder is messed." *Id.* Of course, an officer might suspect a family member of lying about an arrestee's injury, but her age and the excitement under which she was acting (she was yelling) made it less likely that she was making-up an injury on the spot. And even if the officers did not believe the assertions of Freeman and his daughter, Freeman testified that he was "screaming in pain the whole way" to the Markham Courthouse and asked that the handcuffs be removed. Freeman Dep. at 258:7-18. According to Freeman, his shoulder was dislocated due to the handcuffing. *Id.* at 234:18-23. A reasonable factfinder crediting Freeman's version of events could conclude that any officer who heard the statements of Freeman and his daughter and heard Freeman crying out in pain for several minutes would know that handcuffing Freeman behind his back was aggravating his preexisting injury and causing him pain.

This injury to Freeman would not constitute excessive force if handcuffing him behind his back was "necessary to ensure safety." *Rabin*, 725 F.3d at 636. But

the Sheriff Defendants do not argue that Freeman presented a risk of flight or threat of injury. Although Freeman had been difficult to locate and struggled to get out of his car, Defendants present no evidence to suggest that, once Freeman was removed from his car, he resisted arrest or attempted to flee. The risk of flight or injury was particularly minimal when Freeman was locked in the back of a squad car. By this point, the injury to Freeman was apparent because he was "screaming in pain" and asking the officers to remove his handcuffs. Freeman Dep. at 258:7-15; *see also Rabin*, 725 F.3d at 636 (holding that no reasonable officer aware of a detainee's "bad neck" and "bad hand" would "have believed that exacerbating [the detainee's] medical conditions … was necessary to ensure safety" when the detainee was handcuffed in a police vehicle). Given the minimal risk of injury or flight after Freeman was removed from his car, the injury caused by leaving Freeman handcuffed when he was in the squad car was not justified by any need to ensure safety. A reasonable jury crediting Freeman's version of events could determine that the use of handcuffs in light of the officers' knowledge of Freeman's preexisting injury was objectively unreasonable and in violation of the Fourth Amendment. *See Stainback*, 569 F.3d at 772 ("An officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems.").

The Sheriff Defendants are also not entitled to qualified immunity on Freeman's excessive force claim. Before Freeman's arrest, it was clearly established law that "an officer may not knowingly use handcuffs in a way that will inflict

unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Rabin*, 725 F.3d at 636 (quoting *Stainback*, 569 F.3d at 772). Based on Freeman's version of events, the officers were made aware of his injuries through his statement, his daughter's statement, and his screams of pain. The officers nevertheless handcuffed him, and kept the cuffs on, even though Freeman posed no threat of flight or injury. No reasonable officer could believe that causing Freeman severe pain when he was subdued in the back of a police car was permissible under clearly established law.

But a problem remains with advancing the excessive-force claim (and the corresponding failure-to-intervene claim) to trial. Yes, Freeman has triable claims (at least as of the time he was put in the squad car) against any officers who were aware of his injury, but Defendants are nonetheless entitled to summary judgment on these claims. When evaluating claims that the use of handcuffs caused unnecessary pain or injury, the key question is "whether the officer knows that he is inflicting such pain." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014). Failure to intervene also requires knowing about the underlying violation.[9] *Montaño v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008). Freeman fails to identify *which* Defendants were in a position to hear his statement, his daughter's statement, or his cries of pain. And the record before the Court, even digging through the record for Freeman (remember, he did not file a response), provides insufficient basis upon

---

[9]Although a plaintiff does not necessarily need to identify his assailant to establish liability for failure to intervene, *see Sanchez v. City of Chicago*, 700 F.3d 919, 925-26 (7th Cir. 2012), he must demonstrate that the defendants who failed to intervene had reason to know that excessive force was being used, *Montaño*, 535 F.3d at 569.

which to reasonably infer which officers were even present at Freeman's arrest, let alone which officers handcuffed him or were in a position to learn about his injury. The arrest report names all the Sheriff Defendants, but it does not state which of the officers were present at Freeman's arrest, which of the officers put him into handcuffs, or which of the officers transported him to the Markham Courthouse. *See generally* Arrest Report. Nor does Freeman know which officers were present at his arrest. When asked what Cammack did to cause his injuries, Freeman replied: "I couldn't tell you specifically. I don't know which person did what. All I know is that when the lawyer got the information on the sheriffs' names, that's when I knew who it was." Freeman Dep. at 274:22-275:3. When he was asked if Johnston was present at his arrest, Freeman said that "I don't know. I want to give them—I want to have them—I'm going to file a motion for the judge for a deposition for them to answer too." *Id.* at 275:4-12. When asked what James Davis did to cause his injuries, Freeman responded that "I don't know anybody, what participation they had. My public defenders would not go that avenue [sic]." *Id.* at 275:13-22. Nor did Freeman try to provide facts that might be reasonably viewed as narrowing down who did what, or who was where; for example, there is no specific physical description, whether as to height, weight, race, or uniform. Without any basis to infer that any particular officer was in a position to hear what Freeman said about his injury, what Freeman's daughter said about his injury, or Freeman's cries of pain, it is not possible to determine which Defendants used excessive force or were in a position to intervene.

17

It is unfortunate that Freeman's own litigation conduct resulted in him not having the assistance of counsel to conduct discovery or prepare his response to the motion for summary judgment. Assistance of counsel could very well have resolved the issues necessitating summary judgment here—for example, through depositions of the Defendant officers. But Freeman behaved unreasonably in dealing with his court-appointed counsel, and his *pro se* status is his own doing. *See* R. 59, July 2, 2013 Minute Entry (granting first appointed counsel's motion to withdraw); R. 75, May 2, 2014 Minute Entry (granting second appointed counsels' motion to withdraw). As discussed with Freeman when his appointed counsel moved to withdraw, he is entitled to think and say what he wants without fear of government censorship, but if his lawyers ask him to refrain from using offensive language in the context of an attorney-client relationship, he cannot refuse and expect to keep them as lawyers. Unfortunately for Freeman, he is paying the price for his unreasonable conduct now. Because there is no evidence from which a reasonable factfinder could infer which, if any, Defendant was in a position to learn of his injury, Freeman cannot establish that any Defendant used excessive force or was in a position to intervene in the use of excessive force. Summary judgment is granted on these claims.

### C. Municipal Liability

Under the *Monell* theory of liability, a municipal corporation—like Cook County—may be held liable for the constitutional injuries inflicted by its agents if the injury was caused by an official policy or custom. *Monell*, 436 U.S. at 694. But a

municipal corporation is only liable under § 1983 for acts that it officially sanctioned or ordered; a plaintiff cannot simply rely on *respondeat superior*. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). To properly allege a claim of municipal liability, therefore, Freeman must show that his injury was caused by "(1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury." *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 844 (7th Cir. 2004). He has not done so.

At the summary judgment stage, the moving party can discharge its burden by "pointing out to the district court … that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The nonmoving party "must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 325). To meet this burden, the nonmovant must "'go beyond the pleadings' … to demonstrate that there is evidence 'upon which a jury could properly proceed to find a verdict' in [his] favor." *Id.* (quoting *Anderson*, 466 U.S. at 251). Here, Cook County pointed to the absence of any record evidence of a County policy, custom, or practice that caused Freeman's injury. Sheriff Defs.' Br. at 9-10. And indeed, nothing in the record before the Court reflects any such policy. Freeman failed to respond with any evidence that would support an

inference of a policy or custom—he has failed to respond at all. Cook County is therefore entitled to summary judgment on the municipal-liability claim.[10]

## IV. Conclusion

For the reasons discussed above, both the Clerk Defendants' motion for summary judgment and the Sheriff Defendants' motion for summary judgment are granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 18, 2015

---

[10]Because there is no evidence of a policy or custom, the Court need not address the County's argument that it is not the proper party for Freeman's *Monell* claim.